BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**JULIA E. JARRETT**
Julia.Jarrett@usdoj.gov
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone:    503-727-1000
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND  DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | Case No.  **3:20-cv-01915-BR** |
| **v.** | **COMPLAINT *IN REM* FOR FORFEITURE** |
| **TWO (2) REAL PROPERTIES (DEFENDANT REAL PROPERTIES), LOCATED IN JACKSON COUNTY, WITHIN THE STATE AND DISTRICT OF OREGON, WITH BUILDINGS, APPURTENANCES AND IMPROVEMENTS, *in rem*,** | |
| **Defendants.** | |

Plaintiff, United States of America, by Billy J. Williams, United States Attorney for the

District of Oregon, and Julia E. Jarrett, Assistant United States Attorney, for its Complaint *in rem*

for forfeiture, alleges:

**Complaint *in rem* for Forfeiture**                                                                    **Page 1**

## COUNT 1

### I.

This Court has subject matter jurisdiction, *in rem* jurisdiction, and venue pursuant to 21 U.S.C. § 881; 28 U.S.C. §§ 1345, 1355, 1356, and 1395; and 19 U.S.C. § 1610.

### II.

Defendants, *in rem*, consist of two (2) real properties, further described as:

a. **351 Hamilton Road, Jacksonville, Oregon, 97530**: more particularly described as,

Beginning at the quarter corner between sections 3 and 4 in Township 39 South, Range 3 West of the Willamette Meridian in Jackson county, Oregon; Thence, East 895.7 feet to the center line of the Applegate river; Thence, along said center line; North 52 degrees 30' West 552.3 feet, North 48 degrees 45' West 258.8 feet, North 34 degrees 40' West 46.3 feet to the section line, thence South, along said line between said sections 3 and 4, a distance of 887.0 feet to the point of beginning; and

b. **528 Lomas Road, Jacksonville, Oregon, 97530**: more particularly described as,

Tract A – Beginning at a 1' iron pin on the Southernly boundary of Cameron Road which bears South 36.7 feet and West 173.63 feet from the Northeast corner of Section 4 in Township 39 South, Range 3 West of the Willamette Meridian in Jackson county, Oregon; Thence, North 89 degrees 55' 40" West, along said road boundary, 36.6 feet; Thence South 17 degrees 04' West116.79 feet; Thence South 28 degrees 40' 30" West 365.57 feet; Thence South 65 degrees 43' 30" West 523.40 feet; Thence North 35 degrees 55' West 320.13 feet; Thence South 20 degrees 35' 20" West 378.37 feet to a ¾ iron pin; Thence South 88 degrees 37' West 1788.85 feet to a ¾ inch iron pin witness corner; Thence continue South 88 degrees 37' West 40.00 feet, more or less, to a point on the West boundary of Donation land claim no. 39, said township and range; Thence North, along said West boundary, 157.59 feet to the Southeast corner of tract described in instrument No. 73-0934 of the official records of Jackson county, Oregon; Thence North 89 degrees 14' West, along the south line of said tract, 481.84 feet; Thence, South 87 degrees 12' 55" West 453.51 feet to a point on the West line of the Northeast quarter of said section 4 ; Thence South 00 degree 09' 22" East, along said West line, 30.00 feet to a point South 00 degree 9' 22" East 765.39 feet from the Northwest corner of said quarter-quarter; Thence North 87 degrees 12' 55" East 452.5 feet; Thence South 89 degrees 14' East 180.00 feet; Thence South 68 degrees

41' 53" East 182.58 feet; Thence South 42 degrees 21' 21" East 196.84 feet to a 5/8" diameter iron rod on the West line of Donation land claim no. 39, said township and range, said point also bears South 944.52 feet from a point on the North line of said section 4 which is 396.00 feet Westerly from the North quarter corner of said section 4; Thence South 31 degrees 55' 40" East 553.48 feet; Thence South 04 degrees 01' 36" East 388.49 feet to the South line of said Donation land claim no. 39; Thence East, along said South boundary, 76 feet to the Northwest corner of lot 4 in section 4, said township and range; Thence South, to the Southwest corner of said lot; Thence East, along the South boundary of lots 3 and 4 to the East quarter corner of section 4, said township and range; Thence North, along the East boundary of section 4, to a point in the center of the Big Applegate river which bears South 1807.57 feet on a rectangular coordinate basis from the Northeast corner of said section; Thence 40 degrees North 01' 50" West, along the river center, 953.05 feet, more or less, to a point which bears South 17 degrees 57' 20" East 443.28 feet a distant from a ½" iron pin witness corner; Thence North 30 degrees 31' 50" West, along the river center 443.23 feet; Thence North 65 degrees 43' 30" East 97.09 feet to said witness corner; Thence continue North 65 degrees 43' 30" East 389.20 feet; Thence North 28 degrees 40' 30" East 238.54 feet to a rectangular iron bar; Thence continue North 28 degrees 40'30" East 142.21 feet to a ¾" iron pipe; Thence North 17 degrees 04' East 131.04 feet to the point of beginning. Excepting therefrom the following: Commencing at an 1" iron pin on the South line of Hamilton road (formerly Cameron road) said pin bears South 36.7 feet and West 173.63 feet from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe, thence South 28 degrees 40' 30" West 142.21 feet to a rectangular bar, thence North 71 degrees 38' 45" West 35.58 feet to the true point of beginning; Thence South 27 degrees East 30.27 feet; Thence South 28 degrees 40' 30" West 170.38 feet; Thence South 65 degrees 43' 30" West 41.49 feet; Thence North 28 degrees 40' 30" East 220.57 feet to the true point of beginning.

Tract B – Commencing at a 1" iron pin on the Southerly boundary of Cameron road which bears South 36.7 feet and West 173.63 feet from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe; Thence South 28 degrees 40' 30" West 142.21 feet to a rectangular iron bar for the true point of beginning; Thence continue South 28 degrees 40' 30" West 238.65 feet; Thence North 65 degrees 43' 30" East 197.31 feet to a ¾" iron pipe; Thence North 27 degrees 00' West 143.95 feet to the true point of beginning. Excepting therefrom the following: Commencing at a 1" iron pin on the Southerly boundary of Hamilton road (formerly Cameron road) which bears South 36.7 feet and West 173.63 feet

from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe, thence South 28 degrees 40' 30" West 142.21 feet to a rectangular iron bar; Thence South 27 degrees 00' East 18.16 feet, Thence South 28 degrees 40' 30" West 165.00 feet to a point which is North 24 degrees 16' 30" West 32.00 feet from the North line of tract described in instrument No. 73-02987 of the official records of Jackson county, Oregon, for the true point of beginning; Thence continue South 28 degrees 40' 30" West 47.00 feet to the said North line of tract described in instrument 73-02987; Thence North 65 degrees 43' 30" East, along said North line, 172.41 feet to a ¾" iron pipe; Thence North 27 degrees 00' West 32.00 feet; Thence South 65 degrees 43 30" West 130.00 feet to the true point of beginning,

(hereinafter, DEFENDANT REAL PROPERTIES).

DEFENDANT REAL PROPERTIES are in the District of Oregon, and are now and during the pendency of this action will be within the jurisdiction of this Court.

III.

DEFENDANT REAL PROPERTIES, as described above, were purchased with the proceeds of the sale of an illegal substance (marijuana) in violation of the Uniform Controlled Substances Act, Title 21, United States Code, Section 841, *et seq.*, and are therefore subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6), as more particularly set forth in the Declaration of Special Agent Cameron Wall, Internal. Revenue Service-Criminal Investigations (IRS-CI), marked as Exhibit A, attached and fully incorporated herein by this reference.

**COUNT 2**

IV.

DEFENDANT REAL PROPERTIES were also involved in financial transactions conducted with the intent to promote the carrying on of illegal marijuana manufacturing and

conceal the nature and source of the funds used to purchase the properties in violation of Title 18, United States Code, Section 1956, and are therefore subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A), as more particularly set forth in the Declaration of Special Agent Cameron Wall, Internal. Revenue Service-Criminal Investigations (IRS-CI), marked as Exhibit A, attached and fully incorporated herein by this reference.

## **COUNT 3**

V.

Furthermore, DEFENDANT REAL PROPERTY located at 351 Hamilton Road was used or intended to be used to facilitate the manufacture of an illegal substance (marijuana) with intent to distribute, in violation of the Uniform Controlled Substances Act, Title 21 United States Code, Sections 841, 846, and 856, and is forfeitable to the United States pursuant to the provisions of Title 21, United States Code, Section 881(a)(7), as more particularly set forth in the Declaration of Special Agent Cameron Wall, Internal. Revenue Service-Criminal Investigations (IRS-CI), marked as Exhibit A, attached and fully incorporated herein by this reference.

WHEREFORE, Plaintiff, United States of America, prays that due process issue to enforce the forfeiture of DEFENDANT REAL PROPERTIES, *in rem*; that due notice be given to all interested persons to appear and show cause why forfeiture of these DEFENDANT REAL PROPERTIES, *in rem*, should not be decreed; that due proceedings be had thereon; that these

///

///

///

///

DEFENDANT REAL PROPERTIES be forfeited to the United States; that the Plaintiff United

States of America be awarded its costs and disbursements incurred in this action.

DATED: November 6, 2020.          Respectfully submitted,


BILLY J. WILLIAMS
United States Attorney

*/s/ Julia E. Jarrett*
JULIA E. JARRETT
Assistant United States Attorney

# VERIFICATION

I, CAMERON WALL declare, under penalty of perjury, pursuant to the provisions of 28 U.S.C. Section 1746, that I am a Special Agent with the Internal Revenue Service-Criminal Investigations, and that the foregoing Complaint *in rem* for Forfeiture is made on the basis of information officially furnished and upon the basis of such information the Complaint *in rem* for Forfeiture is true as I verily believe.

*/s/ Cameron Wall*
CAMERON WALL
Special Agent
IRS-CI

DECLARATION OF SPECIAL AGENT CAMERON WALL

I, Cameron Wall, do hereby declare:

**Introduction and Agent Background**

1.      I am a Special Agent employed by the Internal Revenue Service, Criminal Investigation ("IRS-CI"), and have held this position for over ten years.  I have successfully completed the 11-week Criminal Investigator Training Course at the Federal Law Enforcement Training Center and the 16-week Special Agent Basic Training course put on by the Internal Revenue Service.  During this time, I have either conducted or been involved in investigations concerning Title 26 (Income Tax), Title 18 (Conspiracy and Money Laundering), Title 31 (Bank Secrecy Act), and Title 21 (Controlled Substances Act) violations by individuals involved in both legal and illegal occupations.

2.      I have written and directly been involved in writing no fewer than twenty search and seizure warrants, and have participated in the service of no fewer than twenty federal search warrants involving criminal income tax charges, money laundering, drug violations, and other criminal activities during which evidence of criminal violations was seized.

3.      This declaration is being submitted in support of a Complaint *in rem* for Forfeiture of the following real properties:

  a.      **351 Hamilton Road, Jacksonville, Oregon, 97530 (Defendant Real Property 1),** and

  b.      **528 Lomas Road, Jacksonville, Oregon, 97530 (Defendant Real Property 2),** hereafter referred to collectively as, the "**Defendant Real Properties**."

4.      In this declaration I will demonstrate, based on the evidence I have reviewed, that there is probable cause to believe, and I do believe that the **Defendant Real Properties** were purchased

**Declaration of Special Agent Cameron Wall**

with the proceeds of the sale of an illegal substance (marijuana) in violation of the Uniform Controlled Substances Act, Title 21, United States Code, Section 841, *et seq.*, and are therefore subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6).

5.    I will also demonstrate that the **Defendant Real Properties** were involved in financial transactions conducted with the intent to promote the carrying on of illegal marijuana manufacturing and conceal the nature and source of the funds used to purchase the properties in violation of Title 18, United States Code, Section 1956, and are therefore subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

6.    I will also demonstrate that the **Defendant Real Property 1** was used to facilitate the manufacture of an illegal substance (marijuana) with intent to distribute, in violation of the Uniform Controlled Substance Act, Title 21, United States Code, Sections 841, 846, and 856, and is therefore subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(7).

7.    The facts in this declaration come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This declaration is for the limited purpose of establishing probable cause for the Complaint.  Therefore, I have not set forth each fact I have learned during this investigation, but only those facts and circumstances necessary to establish probable cause.

### Legal Description and Current Valuation of Defendant Real Properties

8.    **Defendant Real Property 1** – 351 Hamilton Road, Jacksonville, Oregon, 97530, is more particularly described as;

   a.    Beginning at the quarter corner between sections 3 and 4 in Township 39 South, Range 3 West of the Willamette Meridian in Jackson county, Oregon; Thence, East 895.7 feet to the center line of the Applegate river; Thence, along said center line; North 52 degrees 30' West 552.3 feet, North 48 degrees 45' West 258.8 feet,

North 34 degrees 40' West 46.3 feet to the section line, thence South, along said line between said sections 3 and 4, a distance of 887.0 feet to the point of beginning.

The owner of record for **Defendant Real Property 1** is the Zindagi Revocable Trust. Travis LUTHER and Farinaz WADIA are the co-trustees of the Zindagi Revocable Trust. The Grantor deed was filed on or about April 15, 2015. LUTHER and WADIA purchased the property from Richard and Gayle Lupton on or about September 30, 2010, for $400,000.

9.      **Defendant Real Property 2** – also known as 528 Lomas Road, Jacksonville, Oregon, 97530, is more particularly described as;

   a.      Tract A – Beginning at a 1' iron pin on the Southernly boundary of Cameron Road which bears South 36.7 feet and West 173.63 feet from the Northeast corner of Section 4 in Township 39 South, Range 3 West of the Willamette Meridian in Jackson county, Oregon; Thence, North 89 degrees 55' 40" West, along said road boundary, 36.6 feet; Thence South 17 degrees 04' West116.79 feet; Thence South 28 degrees 40' 30" West 365.57 feet; Thence South 65 degrees 43' 30" West 523.40 feet; Thence North 35 degrees 55' West 320.13 feet; Thence South 20 degrees 35' 20" West 378.37 feet to a ¾ iron pin; Thence South 88 degrees 37' West 1788.85 feet to a ¾ inch iron pin witness corner; Thence continue South 88 degrees 37' West 40.00 feet, more or less, to a point on the West boundary of Donation land claim no. 39, said township and range; Thence North, along said West boundary, 157.59 feet to the Southeast corner of tract described in instrument No. 73-0934 of the official records of Jackson county, Oregon; Thence North 89 degrees 14' West, along the south line of said tract, 481.84 feet; Thence, South 87 degrees 12' 55" West 453.51 feet to a point on the West line of the Northeast quarter of said section 4 ; Thence South 00 degree 09' 22" East, along said West line, 30.00 feet to a point South 00 degree 9' 22" East 765.39 feet from the Northwest corner of said quarter-quarter; Thence North 87 degrees 12' 55" East 452.5 feet; Thence South 89 degrees 14' East 180.00 feet; Thence South 68 degrees 41' 53" East 182.58 feet; Thence South 42 degrees 21' 21" East 196.84 feet to a 5/8" diameter iron rod on the West line of Donation land claim no. 39, said township and range, said point also bears South 944.52 feet from a point on the North line of said section 4 which is 396.00 feet Westerly from the North quarter corner of said section 4; Thence South 31 degrees 55' 40" East 553.48 feet; Thence South 04 degrees 01' 36" East 388.49 feet to the South line of said Donation land claim no. 39; Thence East, along said South boundary, 76 feet to the Northwest corner of lot 4 in section 4, said township and range; Thence South,

to the Southwest corner of said lot; Thence East, along the South boundary of lots 3 and 4 to the East quarter corner of section 4, said township and range; Thence North, along the East boundary of section 4, to a point in the center of the Big Applegate river which bears South 1807.57 feet on a rectangular coordinate basis from the Northeast corner of said section; Thence 40 degrees North 01' 50" West, along the river center, 953.05 feet, more or less, to a point which bears South 17 degrees 57' 20" East 443.28 feet a distant from a ½" iron pin witness corner; Thence North 30 degrees 31' 50" West, along the river center 443.23 feet; Thence North 65 degrees 43' 30" East 97.09 feet to said witness corner; Thence continue North 65 degrees 43' 30" East 389.20 feet; Thence North 28 degrees 40' 30" East 238.54 feet to a rectangular iron bar; Thence continue North 28 degrees 40'30" East 142.21 feet to a ¾" iron pipe; Thence North 17 degrees 04' East 131.04 feet to the point of beginning. Excepting therefrom the following: Commencing at an 1" iron pin on the South line of Hamilton road (formerly Cameron road) said pin bears South 36.7 feet and West 173.63 feet from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe, thence South 28 degrees 40' 30" West 142.21 feet to a rectangular bar, thence North 71 degrees 38' 45" West 35.58 feet to the true point of beginning; Thence South 27 degrees East 30.27 feet; Thence South 28 degrees 40' 30" West 170.38 feet; Thence South 65 degrees 43' 30" West 41.49 feet; Thence North 28 degrees 40' 30" East 220.57 feet to the true point of beginning.

b.      Tract B – Commencing at a 1" iron pin on the Southerly boundary of Cameron road which bears South 36.7 feet and West 173.63 feet from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe; Thence South 28 degrees 40' 30" West 142.21 feet to a rectangular iron bar for the true point of beginning; Thence continue South 28 degrees 40' 30" West 238.65 feet; Thence North 65 degrees 43' 30" East 197.31 feet to a ¾" iron pipe; Thence North 27 degrees 00' West 143.95 feet to the true point of beginning. Excepting therefrom the following: Commencing at a 1" iron pin on the Southerly boundary of Hamilton road (formerly Cameron road) which bears South 36.7 feet and West 173.63 feet from the Northeast corner of section 4 in township 39 South, range 3 West of the Willamette meridian in Jackson county, Oregon, thence South 17 degrees 04' West 131.04 feet to a ¾" iron pipe, thence South 28 degrees 40' 30" West 142.21 feet to a rectangular iron bar; Thence South 27 degrees 00' East 18.16 feet, Thence South 28 degrees 40' 30" West 165.00 feet to a point which is North 24 degrees 16' 30" West 32.00 feet from the North line of tract described in instrument No. 73-02987 of the official records of Jackson county, Oregon, for the true point of beginning; Thence continue South 28 degrees 40' 30" West 47.00 feet to the said North line of tract described in instrument 73-02987; Thence North 65 degrees 43' 30" East, along said North

line, 172.41 feet to a ¾" iron pipe; Thence North 27 degrees 00' West 32.00 feet; Thence South 65 degrees 43 30" West 130.00 feet to the true point of beginning.

The owner of record of **Defendant Real Property 2** is Hanuman LLC, an Oregon limited liability company. Hanuman LLC purchased **Defendant Real Property 2** from Gregory Snow on or about May 7, 2015, for approximately $875,000. According to the original sales agreement, LUTHER and WADIA are listed as the buyers representing Hanuman LLC.

## The Investigation

10.     Based on my training, my discussions with other investigators, and my experience investigating marijuana production and distribution organizations, I know that Southern Oregon is a hotbed of both Oregon Liquor Control Commission ("OLCC")-licensed legal marijuana growing operations and illegal black-market marijuana growing operations. Investigators began to look into LUTHER and other suspected black-market marijuana producers and distributors in January 2015. Investigators initially focused on Confidential Informant 1 (hereafter "CI-1"), who was identified as a black-market marijuana producer, broker, and distributor between Southern Oregon and Atlanta, Georgia. Investigators executed a search warrant at CI-1's residence on April 12, 2017, and found large amounts of bulk marijuana and marijuana products, approximately $40,000 in cash, three guns, and several phones. Based on the investigation to date, LUTHER has been identified by CI-1 and others (as described below) as a large-scale black-market marijuana producer and distributor.

## A.     INTERVIEW WITH CONFIDENTIAL INFORMANT 1 (CI-1)

11.     On November 16, 2018, CI-1 and his/her attorney came to the U.S. Attorney's Office in Portland, Oregon, for a proffered interview. CI-1 has been convicted of felony drug trafficking and money laundering and received a benefit for cooperating with the government, although the

**Declaration of Special Agent Cameron Wall**

government made no promises at the time of cooperation. CI-1 was initially not entirely truthful to investigators and minimized his/her involvement, but later agreed to cooperate, and CI-1 provided the following information in summary, relative to LUTHER:

a.    CI-1 met LUTHER through a mutual friend. LUTHER liked that CI-1 was into the technical aspects of growing marijuana. LUTHER acted as a mentor to CI-1 within the marijuana industry. LUTHER has been growing marijuana for a long time and grew marijuana in Washington State before moving to Oregon.

b.    LUTHER is a "big-time" marijuana grower in the Applegate valley outside of Medford, Oregon. LUTHER has greenhouses on his property outside of Medford. CI-1 was then employed by LUTHER and his wife, WADIA, through Forcefield Greenhouses. CI-1 sold greenhouses and fans for Forcefield Greenhouses.

c.    WADIA is a businesswoman with approximately five different businesses. WADIA manages all of LUTHER's money and pays all of the marijuana business-related bills.

d.    CI-1 has seen large amounts of cash at LUTHER's Hamilton Road property, identified as **Defendant Real Property 1.**

e.    LUTHER uses pesticides on his marijuana plants, which lowers the quality of the finished marijuana product. LUTHER gets his pesticides from outside the U.S., which means they are extremely potent. LUTHER is currently producing marijuana oil from his

marijuana plants, but he cannot sell the oil to legitimate dispensaries because of the presence of the pesticides.

f.      Shortly after meeting LUTHER, CI-1 sold approximately 100 to 200 pounds of LUTHER's marijuana for about $1,500 per pound on the local (Oregon) black market.

g.      LUTHER currently produces about 20,000 pounds of processed marijuana per year.  LUTHER has 12 to 20 Mexican nationals working for him on his marijuana growing operations and has a forklift on the property to move the marijuana.

h.      LUTHER has 10 to 20 outdoor marijuana growing operations. LUTHER has multiple greenhouses on his property, each containing about 500 marijuana plants.

i.      LUTHER has out-of-state marijuana customers who purchase between 500 and 1,000 pounds of marijuana at a time from LUTHER.

j.      Beginning in the summer of 2018, CI-1 became aware that LUTHER was processing approximately 500 liters of marijuana oil per week in one of the greenhouses at **Defendant Real Property 1**.

k.      LUTHER has profited between $40 million and $50 million from the sales of marijuana.

l.      LUTHER is currently being sued for about $21 million by customers who purchased hemp seeds from LUTHER.  The seeds LUTHER sold them were purportedly feminized but actually were not and the plants grown from the seeds contained too much THC.

m.      CI-1 identified phone numbers to investigators as being associated to Travis LUTHER, including a phone number ending in 9037.  CI-1 also told investigators that

**Declaration of Special Agent Cameron Wall**

LUTHER does not usually respond to inquiries about drug sales via text message, and that LUTHER is hesitant to talk about drug sales on the phone and keeps conversations short.

n.      CI-1 forwarded two text messages between CI-1 and LUTHER's number ending in 9037, and explained the circumstances surrounding the text messages.  CI-1 sent a friend of his/hers to LUTHER's farm (**Defendant Real Property 1**) to purchase marijuana oil.  On July 16, 2018, CI-1 sent LUTHER a message stating, "Can I send a friend over real quick?" LUTHER responded, "Sure but nothing new."  CI-1 does not know how much marijuana oil his/her friend wanted from LUTHER.  CI-1 assumed the deal went through because he/she was not contacted by the friend again, relative to the deal with LUTHER. On August 6, 2018, CI-1 sent LUTHER a text message, "Just Jelly." LUTHER responded to CI-1 with, "farm fresh." CI-1 replied to LUTHER with, "cheap oldie hits?" CI-1 told investigators that this was in reference to LUTHER having any older, cheaper marijuana oil available.  LUTHER did not respond to CI-1's last text message.

**B.      INFORMATION FROM CONFIDENTIAL INFORMANT 2 (CI-2)**

12.     In late April 2019, Medford Area Drug and Gang Enforcement ("MADGE") detective Mark Cromwell received a phone call from CI-2.  CI-2 is an active MADGE informant and is currently assisting the investigation into LUTHER in exchange for consideration on sentencing reductions on CI-2's own criminal charges.  CI-2 has provided information for other investigations and the information he/she provided has been reliable in the past.  CI-2 provided the following information to Detective Cromwell:

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A   PAGE 8
                                                              Complaint *In Rem*
                                                              FOR FORFEITURE

a. CI-2 had previously met a person who was selling marijuana trim to LUTHER (hereafter "Person-1").  Marijuana trim is directly used to produce marijuana concentrate products such as butane honey oil ("BHO") and marijuana distillates. (Investigators note: BHO and marijuana distillates are both marijuana by-products created by various chemical and lab processes). Person-1 bragged to CI-2 about how big LUTHER's operation was and that LUTHER's marijuana farm was near Ruch, Oregon.  CI-2 later confirmed the address of LUTHER's marijuana operation to be at 351 Hamilton Road, **Defendant Real Property 1**.

b. In late April 2019, CI-2 met with Person-1 in White City, Oregon.  Person-1 asked CI-2 to transport 120 pounds of marijuana trim to LUTHER's marijuana operation. Person-1 told CI-2 to contact "Joe" at LUTHER's farm and gave him a phone number to contact Joe.  CI-2 put the marijuana trim in his vehicle and he drove to **Defendant Real Property 1**.

c. When CI-2 got to **Defendant Real Property 1**, he drove down a long driveway.  CI-2 observed a fork in the driveway, and the right fork of the driveway led to a nice residence that sits up on top of the hill.  Investigators were able to identify this property as 528 Lomas Road, **Defendant Real Property 2**. The left fork led to LUTHER's marijuana operation with the greenhouses on it.  CI-2 parked near the greenhouses on the property at **Defendant Real Property 1.**

d. CI-2 waited 10 to 15 minutes but no one at the farm acknowledged CI-2's presence. After approximately 15 minutes, a white male CI-2 later identified as LUTHER drove down from near the residence at **Defendant Real Property 2** in a blue truck and

**Declaration of Special Agent Cameron Wall**

parked at **Defendant Real Property 1**.  LUTHER was on the phone for several

minutes, so CI-2 got out of his/her vehicle and approached LUTHER as LUTHER was

still in the blue truck.

e.  CI-2 asked LUTHER for Joe, but LUTHER told CI-2 that Joe was sleeping and that

LUTHER could handle the purchase of CI-2's marijuana trim.  LUTHER took the trim

into a small building near a greenhouse and returned a few minutes later. LUTHER

had weighed the trim and told CI-2 it was 120 pounds.

f.  LUTHER took out two bundles of cash from his back pocket to pay CI-2 for the trim.

LUTHER gave CI-2 $2,500 in cash for the marijuana trim.  CI-2 left **Defendant Real

Property 1** and met up with Person-1, and CI-2 paid Person-1 $2,250 of the proceeds

of the sale of trim from LUTHER.

13.    Investigators met with CI-2 again and provided CI-2 with drug buy money.  Investigators

outfitted CI-2 with audio/video recording equipment.  CI-2 met with "Joe" at **Defendant Real

Property 1** with the goal of purchasing marijuana in various forms.  The following is based on

investigators' review of the audio and video recordings of the encounter.

a.  CI-2 and "Joe" had a conversation inside one of the greenhouses located at **Defendant

Real Property 1**.  A second male entered the greenhouse where CI-2 and Joe were

talking.  A conversation occurred related to the price of marijuana for sale.  The

second male said he thought he was going to get "14–15 for the deps," and then the

second male and CI-2 negotiated a price of $1,450 per pound of light deprivation

marijuana.  Based on my training and experience, I know that light deprivation is a

technique of growing marijuana where the grower can control the light conditions of

the grow and create faster flowering, but the quality and thus price is generally lower than other marijuana.

b.  The second male and CI-2 started discussing how hard it is to currently find marijuana and the second male said he sold "weed too" and that he sold 2,000 pounds in two weeks, and then a month later had a hard time finding a "hundred pack," which is slang for 100 pounds of marijuana.  The second male identified himself as the manager of the lab on site and told CI-2 they also sell greenhouses. CI-2 asked how much the greenhouses go for, and the second male responded, "half a mil," meaning $500,000.

c.  The second male and CI-2 walked to another greenhouse, and the second male told CI-2 that they harvested "250" per pull, meaning 250 pounds of marijuana per harvest, three times a summer, totaling 750 pounds of marijuana.  The second male told CI-2 that even if they sold it at $800 a pound, they would still make money.  The second male told CI-2 that their marijuana crops did not even get seeded inside the greenhouses and that they grew hemp right next to it last year.  CI-2 got video of marijuana plants growing inside one of the greenhouses, and the second male told CI-2 that there were 400 marijuana plants inside the greenhouse.

d.  CI-2 asked the second male if he "would be able to do two of those today?" CI-2 was referring to liters of marijuana distillate.  The second male replied, "If you have money."  The second male asked CI-2 if CI-2 wanted him to "bag them up?" CI-2 also ordered three pounds of marijuana at the previously negotiated $1,450 per pound.  CI-2 returned to his vehicle to retrieve the buy money, and the video shows Joe packaging

up marijuana distillate for CI-2.  CI-2 gave the money to Joe, who counted the cash on video.

e.  The second male then talked to CI-2 about sealing marijuana bags for transport, and the second male told CI-2 he transported marijuana to California for a woman there. The second male then told CI-2 he has 25–30 liters of marijuana distillate, and he transports it to Los Angeles, California, because it is worth more down there.  The second male said they charge $100 less in Oregon than in California because the trip to Los Angeles costs time and money.

f.  After the conversation, CI-2 left the property with 1.5 liters of marijuana distillate and the three pounds of processed marijuana, which CI-2 turned over to investigators.  CI-2 paid $8,400 for the distillate, and $4,350 for the processed marijuana.

## C.    POWER RECORDS FOR PROPERTY

14.    Pacific Power provided electrical utility records for **Defendant Real Properties 1 and 2**, which show that LUTHER has two utility accounts for **Defendant Real Property 1**:  one for the residential part of the property and one for the greenhouse part of the property. During the period December 2015 to January 2019 (38 months, just over three years), the power usage for the residence and the greenhouse at **Defendant Real Property 1** were as follows:

| Account | Usage (KWH) | Invoice Amounts |
|---|---:|---:|
| Residential | 367,536 | $46,521.93 |
| Greenhouse | 1,289,400 | $121,524.93 |
| **Total** | **1,656,936** | **$168,046.86** |

15.    Based on my training and experience, I know that marijuana production requires large amounts of electricity to run heating and lighting systems, filters, water filtration systems, and other machinery involved in the production process.  The average monthly bill for the

**Declaration of Special Agent Cameron Wall**

**Defendant Real Property 1** greenhouse account over the 38 months is $3,198, which demonstrates a large monthly energy consumption.

16.    Most of the payments made on the account were round-dollar amounts between $800 and $2,300, and the records indicate most payments were made by "check or cash equivalent presented at local businesses."  Based on my training and experience investigating marijuana production and distribution organizations, the high usage of power on the greenhouse account and the round-dollar payments on the electrical power accounts indicate the involvement with marijuana production, and the funds used to pay the account are most likely cash, which is another indication of involvement in marijuana production and distribution.

17.    Power records for **Defendant Real Property 2** appear to be consistent with typical residential energy consumption.

**D.    STATUS OF OLCC & OMMP PERMITS ON PROPERTY**

18.    Based on my training and experience conducting drug and related financial investigations, I know that black-market marijuana distributors seek to legitimize their business and income streams by taking advantage of Oregon's legal recreational and medical marijuana programs.

19.    As of the time of the search warrant, OMMP rules permitted patients to have six mature plants, 18 seedling plants, and 24 ounces of processed marijuana.  Growers were allowed to have six mature marijuana plants, 18 seedling plants, and 24 ounces of processed marijuana per patient.  Under OLCC rules at the time of the search warrant, licensed marijuana producers were required to follow a long list of requirements, including "seed-to-sale" tracking of their

marijuana production and distribution.  Neither OMMP nor OLCC rules allowed marijuana

producers in Oregon to ship or otherwise sell marijuana outside of the state of Oregon.

20.     According to OMMP records reviewed in July 2019, **Defendant Real Property 1**'s

approval to grow under OMMP rules expired on October 2018, and **Defendant Real Property

2**'s approval to grow under OMMP rules expired September 2016.  LUTHER was listed as an

OMMP caregiver, but his permit expired in December 2018.  WADIA was listed as an OMMP

patient and grower for herself, but those approvals expired in October 2018.

21.     According to OLCC records reviewed in July 2019, LUTHER and WADIA submitted

and later withdrew two applications in the name of Siskiyou Grown, located at **Defendant Real

Property 2**, one to be a marijuana producer and one to be a marijuana processor.  These

withdrawn applications identify LUTHER and WADIA as processors.  There are no

active/current OLCC licenses or applications for the **Defendant Real Properties**.

**E.     AUGUST 6, 2019 SEARCH WARRANT AT LUTHER PROPERTIES**

22.     On August 6, investigators from IRS-CI, Oregon State Police, Medford Police

Department, Drug Enforcement Administration, Homeland Security Investigations, U.S.

Marshals Service, and Jackson County Sheriff's Office executed federal search warrants at the

**Defendant Real Properties**. LUTHER and WADIA were at **Defendant Real Property 2** when

law enforcement executed the warrants.

23.     Investigators found the following relevant items of evidence at **Defendant Real

Property 1 (Hamilton)**:

         a.      Two firearms;

         b.      Three phones;

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A  PAGE 14
                                                                 Complaint *In Rem*
                                                                 FOR FORFEITURE

      c.        A functional and active BHO extraction lab;

      d.        Three active marijuana growing operations (one in the residence at **Defendant Real Property 1**, two in large greenhouses on **Defendant Real Property 1**);

      e.        Approximately 3,455 marijuana plants in all stages of growing (DEA-post warrant testing confirmed these as marijuana plants, not hemp, as further described below);

      f.        Approximately 11,040 pounds of bulk and processed marijuana and marijuana finished products, like BHO and THC distillate; and,

      g.        Numerous drug manufacturing ledgers as further discussed below.

24.     Investigators found the following items of evidence at or adjacent to **Defendant Real Property 2 (Lomas)**:

      a.        Approximately 150,000 hemp plants out in the fields surrounding **Defendant Real Property 2** (these were not seized during the warrant, and the amount is an estimate from DEA based on the amount of property and the density of the plants per acre);

      b.        Greenhouse containing suspected hemp plant material

      c.        Three guns;

      d.        Five phones; and,

      e.        Approximately $39,000 in U.S. currency.

## F.    DEA POST-WARRANT SAMPLING AND TESTING OF SUSPECTED MARIJUANA

25.     On the date of the warrants at the **Defendant Real Properties**, DEA agents took samples of suspected live marijuana plants, processed bulk marijuana, and marijuana finished products, and sent them to a DEA lab for testing and analysis. The results of that analysis are as follows:

a.      Sampling from plant materials inside three greenhouses at the north end of **Defendant Real Property 2** were inconclusive for THC content. Based on the proximity of these greenhouses to the hemp fields, investigators believe that the plant material in these greenhouses was most likely hemp, not marijuana.

b.      Sampling from dried marijuana inside the greenhouse/lab at **Defendant Real Property 1** was confirmed to be marijuana.

c.      Sampling from liquid suspected marijuana distillate buckets inside the greenhouse/lab at **Defendant Real Property 1** indicated the presence of THC but the percentage was inconclusive.

d.      Sampling from liquid suspected marijuana distillate in flasks inside the greenhouse/lab at **Defendant Real Property 1** indicated the presence of THC and in five of the six samples, the THC level was over 1% (indicating the presence of marijuana). For the other sample that contained THC, the percentage was inconclusive.

e.      Sampling from five bottles taken from first room inside the greenhouse with the lab on **Defendant Real Property 1** indicated that two of the five bottles contained THC levels over 1%, one of the bottles contained Hashish, and two of the bottles' contents were inconclusive.

f.      Sampling from three green plastic buckets in the fifth room of the greenhouse with the lab on **Defendant Real Property 1** indicated that all three samples contained THC over 1%.

g.      Testing of sampling from 450 suspected marijuana plants inside the middle greenhouse on **Defendant Real Property 1** was not completed by DEA.

**Declaration of Special Agent Cameron Wall**

h.      Sampling from 440 suspected marijuana plants inside the NE greenhouse on **Defendant Real Property 1** indicated the presence of marijuana.

i.      Sampling from 2,565 suspected marijuana plants inside and outside the residence at **Defendant Real Property 1** indicated the presence of marijuana in 23 of 29 samples – the other six samples were inconclusive.

j.      Sampling from the fields of suspected hemp surrounding **Defendant Real Property 2** and adjacent to **Defendant Real Property 1** tested inconclusive for marijuana, which indicates that the plants in the fields were most likely hemp, not marijuana (as investigators believe).

k.      In summary, DEA testing confirmed the presence of marijuana in almost all of the suspected marijuana plants in the greenhouses. The testing indicated the presence of THC in excess of 1% in the distillate and marijuana by-products inside the lab. The testing also indicated that the fields around the **Defendant Real Properties** are most likely hemp. Based on the evidence found during the search warrant and summarized in this affidavit, investigators believe that both hemp and marijuana were being processed within the lab at **Defendant Real Property 1**, which explains the mixed results on the testing of the distillate products.

## G.      DOCUMENTARY EVIDENCE FROM SEARCH WARRANTS

26.     There were numerous pieces of documentary evidence found during the August 6, 2019 search warrants at the **Defendant Real Properties**, summarized below:

27.     **Jars Log Binder** – Investigators found a white binder labeled "Jar Logs" inside the extraction lab in the first greenhouse on **Defendant Real Property 1**. The binder contains

**Declaration of Special Agent Cameron Wall**

notations about production batch records from batch #100 on or about February 17, 2019 through batch #177 on August 4, 2019. These notes summarize the production of 413,213 grams of apparent marijuana distillate products, split into "Clear" (395,185 grams) and "Red Zone" (22,298 grams). CI-3 (below) confirmed these notebooks to be production records for LUTHER's BHO extraction lab, and CI-3 told investigators that probably 80% of the total amount produced was THC distillate from marijuana.

28.     **Joe's Book –** Investigators found a blue spiral notebook labeled "Joe's Book" inside the extraction lab in the first greenhouse on **Defendant Real Property 1**. The notebook contained a written running record of the total grams produced in the lab production batches, starting with batch #53 on October 23, 2018 to batch #163 on July 14, 2019. This notebook summarizes the production of approximately 706,672 grams of distillate product.

29.     **Jars Out Log –** Investigators found a red spiral notebook labeled "Jars Out" inside the extraction lab in the first greenhouse on **Defendant Real Property 1**. The notebook is a rough listing of the distribution of at least 510,872 grams of clear distillate and a small amount of distillate-infused products (shatter and vape pens) during the period June 2018 to March 2019. CI-3 confirmed that this ledger was a running chronological record of distillate distribution.

30.     **Expenses Notebook –** Investigators found a purple spiral notebook labeled expenses in the extraction lab in the first greenhouse on **Defendant Real Property 1**. The notebook outlined a contract breakdown of the financial agreement between LUTHER and his employees (as follows):

    10% for new equipment
    10% Brice
    1% Pat
    1% GC

**Declaration of Special Agent Cameron Wall**

      1% Split clear crew
      1% Aaron
      .5% Ben.
      .5% Split for BHO Crew
      75% House
      Workers get paid first

31.    CI-3 confirmed the financial breakdown outlined in the purple Expenses notebook as being accurate, and that the "House" was LUTHER.

32.    **Blue Tops Spiral Notebook -** Investigators found a blue spiral notebook inside the residence at **Defendant Real Property 1**. The notebook contains more than 40 pages of apparent marijuana trim purchase records and marijuana distribution records. The pages contain names or abbreviations of names with numbers below each name that I believe are marijuana trim purchases (in grams) for each month. In total, the notebook details the purchase of approximately 1,160 pounds of trim for approximately $304,000. The payments were made consistently for $.26/gram. The notebook also contains seven pages that detail running sales records for the distribution of various strains of marijuana. The total purchases summarized by the notebook are approximately $3,699,600 (there appears to be a $7,100 math error, so the true total is $3,692,500). There are no dates on the trim purchasing or marijuana distribution pages, but there

**Declaration of Special Agent Cameron Wall**           EXHIBIT A   PAGE 19
                                               Complaint *In Rem*
                                            FOR FORFEITURE

is a notation in the notebook which reads, "paid Forrest 65,000 (soil) 9/26/16," leading me to believe that this notebook is for the 2016 marijuana growing season.

33.     These documents indicate that LUTHER was heavily involved in the purchase of marijuana trim for the purchase of creating marijuana distillate and was also involved in the distribution of large amounts of black market marijuana.

## H.     INTERVIEW WITH CONFIDENTIAL INFORMANT 3 (CI-3)

34.     On September 25, 2019, investigators interviewed CI-3 at the U.S. Attorney's Office. CI-3 was accompanied by an attorney, and provided the following information in summary:

a.     CI-3 was introduced to LUTHER in 2018 by a mutual friend who ran LUTHER's BHO extraction lab. CI-3 began working in LUTHER's lab shortly thereafter.

b.      CI-3 began to run LUTHER's BHO extraction lab after working there for a while. CI-3 diagrammed LUTHER's greenhouse lab and identified the purpose of each room in the greenhouse.

c.     CI-3 reviewed a copy of the expenses notebook and the financial breakdown described in paragraph 68 above, and confirmed that LUTHER was the "house." CI-3 kept records detailing the number of jars of distillates made, sold, and distributed out of the state of Oregon. No records were kept for BHO production. CI-3 confirmed that he kept the Jars Out and Expenses notebooks detailed above.

d.     Investigators showed CI-3 the logs and asked CI-3 if the amount of distributed distillate, 500,000 grams, was accurate. CI-3 told investigators that amount sounds about right. LUTHER did not show much interest in maintaining records of distillate amounts made, sold, or distributed, so CI-3 stopped keeping records around August 2018.

e.      CI-3 estimated that of all the distillate products being made in LUTHER's lab,

80% of them were THC (marijuana) distillate and 20% of them were CBD (hemp

distillate). CI-3 explained that there was not much of a market for the CBD distillate

product, and the vast majority of sales was a THC distillate product called "clear."

f.      Investigators showed CI-3 notebooks labeled "Jar Logs" and "Clear Lab-Shift

Logs" and CI-3 confirmed that they were information pertaining to LUTHER's lab and

the distillate being manufactured there.

g.      Investigators reviewed a notebook labeled "Joe's Book" with CI-3 that indicated

that at least 706,672 grams of distillate was created in LUTHER's lab from October 2018

to July 2019. CI-3 confirmed that the records appeared to be accurate.

h.      LUTHER's lab created between 40 to 100 liters of distillate a month. The average

price of a liter of distillate was $5,500. CI-3 sold the distillate in Portland, the Bay area,

and Southern California. CI-3's biggest customer purchased 10 to 20 liters at a time for

$5,200–$5,500 a liter. The customer had connections to New York but lived in Los

Angeles. CI-3 visited the customer in Los Angeles approximately twice a month and

came back to LUTHER's house each time with between $50,000 and $150,000 in cash.

CI-3 put the cash in LUTHER's safe in the lab or gave the currency directly to LUTHER.

LUTHER was aware of CI-3 selling LUTHER's distillate outside the state of Oregon.

i.      CI-3 also sold large amounts of LUTHER's distillate to another individual in Los

Angeles in kilogram amounts and watched the individual sell it at his marijuana

dispensary in Los Angeles.

j.      CI-3 confirmed that the plants in LUTHER's two greenhouses on **Defendant Real Property 1** during the service of the search warrant were indeed marijuana. The plants behind the red house on **Defendant Real Property 1** were also marijuana and were the next round of plants to go in the greenhouse. LUTHER harvested his marijuana three times per year.

k.      CI-3 estimated that LUTHER's marijuana growing operation produced between 1,000 and 4,000 pounds of marijuana in 2018. LUTHER brokered the sale of most of the marijuana through another marijuana distributor in Eagle Point, Oregon.

l.      CI-3 used 2,500 pounds of LUTHER's marijuana "shake" (excess marijuana bi-product that contains trace amounts of THC) to make distillate in LUTHER's lab. After that was used up, LUTHER and his employees purchased marijuana shake from other marijuana growers in the area. LUTHER or CI-3 paid people for their shake using cash from the safe inside the lab.

## I.      LUTHER/WADIA BANK ACCOUNT ANALYSIS

35.     During the course of this investigation, investigators obtained financial records of accounts in the names of LUTHER, WADIA, and their businesses.  Organized Crime and Drug Enforcement Task Force ("OCDETF") Financial Investigator Roger Wirth reviewed these accounts and created summaries of activity for each account.  I reviewed and analyzed these summaries of LUTHER and WADIA's banking activity.  My review of these summaries focused on structured cash activity and account transfer activity.  Based on my training and experience investigating drug trafficking organizations, I know that these organizations commonly use cash and money orders to move and disguise the true nature of the proceeds of their illegal activities.

**Declaration of Special Agent Cameron Wall**

36.    In summary, the financial documents reviewed indicate that LUTHER and WADIA deposited large amounts of cash (almost always under $10,000) into their business and personal bank accounts, and then transferred the money via check and wire transfers to other accounts, ultimately to make payments to Pacific Trust Deed Servicing on the **Defendant Real Properties**.

37.    Investigator Wirth identified and reviewed documentation for eleven relevant business and personal accounts in the names of LUTHER, WADIA, or their businesses. Based on the available information and research, I believe that:

a.    Indika Imports is a retail and internet sales business in Ashland, Oregon, specializing in selling handmade and fair-trade gifts and furnishings from India.

b.    Hill Station LLC is a business set up to operate and report Indika's retail activities.

c.    Horn OK Please LLC is a business set up to operate and report Indika's internet sales activities.

d.    Hanuman LLC is an entity set up to purchase **Defendant Real Property 2**.

e.    Cannalogical LLC/Forcefield LLC/Forcefield Greenhouses is a business LUTHER operates to import, distribute, and setup industrial greenhouses and equipment.

f.    Sweet Leaf LLC is a business set up to manufacture and distribute hemp. This business is part of the $21 million dollar lawsuit referenced within this affidavit.

g.    White's Country Farm is a small fruit stand & market in Medford, Oregon that may have also served as a dealer for growing supplies.

38.    I reviewed and analyzed Investigator Wirth's summaries of this information.  The relevant accounts are summarized as follows:

**Declaration of Special Agent Cameron Wall**                EXHIBIT A   PAGE 23
                                                          Complaint *In Rem*
                                                          FOR FORFEITURE

| No. | FINANCIAL INSTITUTION | NAME ON ACCOUNT | ACCT NO. |
|---|---|---|---|
| 1 | U.S. Bank | WADIA & LUTHER | #7152 |
| 2 | U.S Bank | WADIA & LUTHER | #8254 |
| 3 | U.S. Bank | Hill Station LLC | #5679 |
| 4 | U.S. Bank | Horn OK Please LLC | #5687 |
| 5 | Wells Fargo | White's Country Farm | #5384 |
| 6 | Wells Fargo | Forcefield Greenhouses | #9172 |
| 7 | JP Morgan Chase | Forcefield LLC | #5672 |
| 8 | JP Morgan Chase | Forcefield LLC | #3671 |
| 9 | Bank of America | Cannalogical LLC | #1538 |
| 10 | JP Morgan Chase | Hanuman LLC | #0077 |
| 11 | JP Morgan Chase | Sweet Leaf LLC | #6032 |

*PERSONAL ACCOUNTS*

39.    **U.S. Bank Account #7152 (USB 7152)** is a personal account in the names of WADIA and LUTHER, which WADIA opened on or about June 25, 1998.  She later added Travis LUTHER as a signer.  This bank account receives regular payroll checks from USB 5687 (Horn OK Please LLC/Indika) and WF 9172 (Forcefield Green Houses). In May 2017, this account started receiving regular monthly cash deposits of $4,544.70, which continued until December 2017.  The monthly cash deposits picked back up in February 2018, for $4,691.70.  The source of these cash deposits are unknown but appear to be similar to LUTHER and WADIA's payroll check amounts, which continued to be deposited to USB 7152.  USB 7152 also received two large transactions of note:  (1) a large cash deposit of $41,523 on August 23, 2017, which was combined with other funds and withdrawn on the same date via cashier's check made payable to Pacific Trust Deed Servicing Co for $56,530; and (2) a $100,000 check from WF 5384 (White's Country Store) on June 11, 2018, with a memo notation of "Distribution."  Pacific Trust Deed Servicing Co. is the company responsible for handling the property purchases of both **Defendant Real Properties**. The funds deposited to this account were used to pay personal expenses,

**Declaration of Special Agent Cameron Wall**

including over $162,000 towards Pacific Trust Deed Servicing Co., over $153,000 to the Internal

Revenue Service, and over $37,000 to the Oregon Department of Revenue.

40.    **U.S. Bank Account #8254 (USB 8254)** is a personal bank account in the names of

WADIA and LUTHER, which they opened on or about January 2, 2008. This account received

regular check deposits from USB 5687 (Horn OK Please LLC), which appear to be payroll

checks for LUTHER and/or WADIA.  From June 2015 to July 2018, USB 8254 received 43

separate cash deposits in amounts from $4,000.00 to $4,655.70, totaling approximately

$178,000.  During the same period, LUTHER and/or WADIA paid approximately $335,000 in

mortgage and principal payments to Pacific Trust Deed Servicing, and $39,000 to Hanuman

LLC, which is the entity that LUTHER put on the title of **Defendant Real Property 2**.

   *BUSINESS ACCOUNTS*

41.    **U.S. Bank Account #5679 (USB 5679)** is a business account in the name of Hill Station

LLC, which LUTHER and WADIA opened on or about March 11, 2013. Based on a review of

the available documentation, I believe USB 5679 was opened to operate the *retail* business for

LUTHER and WADIA's business, Indika, and USB 5687 (see next paragraph) was opened to

operate the *internet* web business for Indika.  Based on a review of Indika's website,

indikaimports.com, Indika is a retail and internet sales business in Ashland, Oregon, specializing

in selling handmade and fair-trade gifts and furnishings from India.  A review of USB 5679

shows normal business activity, including deposits into from electronic payment processor

Square, Inc.  From March 2013 to July 2018, this account received approximately $118,000 in

cash deposits.  Expenditures from the account look ordinary in nature, except for a check on

August 31, 2015, to LUTHER, which was deposited into USB 8254 (personal account) and used to fund another $25,000 check to Pacific Trust Deed Servicing.

42.     **U.S. Bank Account #5687 (USB 5687)** is a business account in the name of Horn OK Please, which WADIA and LUTHER opened on or about March 11, 2013 (the same day as USB 5679, listed above).  Based on a review of the available documentation and the activity within the account, USB 5687 appears to have been set up to run the internet web business for Indika. The deposit and expenditure activity within USB 5687 appears to be normal for a web-based internet business, except for the cash deposit activity. This account receives credit card receipts and checks from all around the United States, which appears to be consistent with the internet-based retail business for Indika. From March 2013 to July 2018, the account received 98 cash deposits totaling approximately $485,000.  These cash-only deposits were typically large, round-dollar amounts, ranging up to $9,400 and averaging $4,900 per cash deposit.  None of the cash deposits exceeded $10,000.  There were three bunches of cash deposits:  $21,903 between May 2014 and August 2014, $79,730 between January 2015 and April 2015, and $51,421 between June 2015 and September 2015.  Based on my training and experience, normal business cash deposits are not typically in large, round numbers.  This activity is also suspicious because Horn OK LLC appears to be set up to handle internet-based sales, which typically are not in cash. LUTHER and WADIA used the cash deposits, in part, to support approximately $179,000 in checks to WADIA via USB 7512 (personal account), which ultimately funded mortgage payments to Pacific Trust Deed Servicing.

43.     **Wells Fargo Bank Account #5384 (WF 5384)** is a business bank account in the name of White's Country Store, which WADIA opened on or about July 27, 2015.  The signature card

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A   PAGE 26
                                                                Complaint *In Rem*
                                                                FOR FORFEITURE

describes White's Country Farm LLC as a country farm shop.  The business location for White's

Country Store is 3939 W. Main Street, Medford, Oregon.  From July 2015 to November 2018,

the account received 210 cash deposits ranging from $79.00 to $9,940.00, for a total cash deposit

amount of $622,373.81.  There were many small cash deposits of odd numbers, which would be

normal for a small, cash business like a country market.  However, there were at least 84 deposits

in amounts between $3,000.00 and $9,940.00, totaling at least $457,981.57 (71 of the 84 deposits

were cash only).  From physical observations, White's Country Farm is a small country store and

fruit/vegetable stand.  It usually has a fall harvest festival and a Halloween pumpkin event.  The

store appears to be closed during the winter months (November to February); however, the

account received six deposits in February 2018, totaling $32,476.51.  The amount and timing of

those cash deposits do not appear to be representative of a typical small country store/fruit stand,

as described above. WADIA used the cash deposits to fund, in part, over $165,000 in payments

to WADIA and $49,000 in payments to LUTHER, which were presumably payroll payments.

There was also $166,815.92 in payments to Hydrofarm LLC and Hydrofarm Inc., which is a

nationwide distributor of hydroponic growing equipment.

44.     **JP Morgan Chase Bank account #0077 (JPMC 0077)** is a business checking account in

the name of Hanuman LLC, which LUTHER opened on or about March 16, 2018.  WADIA is

also a signer on the account.  This account received $190,108 in cash deposits. $51,000 of those

deposits were made up of twelve, even-dollar deposits of either $4,000 or $4,500.  These

deposits funded monthly checks to Pacific Trust Deed Servicing for mortgage payments on

LUTHER's Lomas Road property, **Defendant Real Property 2**.  There were also three large

checks deposited to this account drawn from other accounts controlled by WADIA and

LUTHER.  Immediately after the first two check deposits came into the account, two large balloon payments of $50,000 and $75,000, respectively, were made to Pacific Trust Deed Servicing.

45.    **Wells Fargo Bank Account #9172 (WF 9172)** is a business bank account in the name of Cannalogical LLC, dba Forcefield, which LUTHER opened on or about November 23, 2015. WADIA is also a signer on the bank account.  From November 2015 to January 2018, the account received 149 cash deposits totaling approximately $1,313,624.  145 out of 149 of those cash deposits ranged in amounts from $2,000 to $9,980, with most of them in the $9,000 range. However, during a nine-week period from June 2017 to September 2017, the account received four much larger cash deposits: $73,470 on 06/28/2017, $48,780 on July 17, 2017, $37,421 on August 14, 2017, and $42,200 on September 7, 2017.  The account received a check on or about December 7, 2015, from CI-1 for $30,000, with the notation, "GH," which I believe to mean greenhouse.  These deposits, along with additional check and wire transfer deposits, funded check and transfer payments for Forcefield's ordinary business expenses.

46.    **JP Morgan Chase Bank Account #5672 (JPMC 5672)** is a business checking account in the name of Forcefield LLC, which WADIA opened on or about January 10, 2018. LUTHER appears to be a signer.  Bank records show that between January 2018 and December 2018, the account received $146,503.67 in cash deposits ranging from $2,000 to $9,173 and including numerous large deposits consisting solely of cash.  The other transactions, including credit card deposits, wire transfer deposits, and interbank transfers, indicate that Forcefield is selling greenhouse supplies and equipment and are consistent with such a business.

47.    **JP Morgan Chase Bank account #3671 (JPMC 3671)** is a business savings account in the name of Forcefield LLC, which LUTHER opened on or about March 16, 2018.  WADIA is also a signer on the account.  The account received three large wire transfers totaling approximately $220,000 from May to August 2018. These reason for the deposits into this account are unknown, but the proceeds from the deposits were disbursed to other JPMC accounts in the name of Forcefield LLC, indicating they were most likely related to Forcefield's business activities.

48.    **Bank of America #1538 (BA 1538)** is a business bank account in the name of Cannalogical LLC (DBA Forcefield Greenhouses), which LUTHER opened on or about December 18, 2013.  From December 2013 to November 2015, LUTHER made approximately 89 cash deposits totaling approximately $477,000, mostly in round-dollar amounts, in the Ashland, Oregon and Medford, Oregon areas. The activity in this account appears to be normal for a greenhouse construction company. The large amount of cash income is considered to be normal, because most of LUTHER's greenhouse business customers are most likely marijuana producers, who deal mainly in cash.

49.    **JP Morgan Chase Bank account #6032 (JPMC 6032)** is a business checking account in the name of Sweet Leaf LLC, which exhibited normal business transactions associated with hemp farming.

## Bank Account Summary

50.    Investigators analyzed bank records related to LUTHER, WADIA, and their businesses from 2013 to July 2019.  The total amount of combined deposits from checks, cash, cashier's checks and money orders was approximately **$7.8 million**.  Of the $7.8 million in deposits and

credits, approximately $4.1 million were cash deposits, which accounted for about 52% of the total deposits. During the time period 2013-2018, there were 724 cash deposits – 719 of them in amounts less than $10,000. Of the 719 cash deposits under $10,000, 110 of them were in amounts between $8,000 and $9,980. There were also 91 even, round-number deposits of $4,000, $5,000, $6,000, or $7,000, of which only 4 of these deposits also included non-cash items. There were also 97 instances in which cash deposits posted to multiple accounts on the same day exceeded $10,000 (Note: occasionally, these 97 instances included Saturday cash deposits that were posted on the following Monday, along with additional deposits of cash).

51.    Investigators later reviewed LUTHER and WADIA's bank records for the period December 2018 to 2019. Investigators found the similar type of behavior as detailed above, i.e. LUTHER and WADIA deposited large amounts of cash to business and personal bank accounts, moved it to different accounts disguised as payroll, and then used the funds to make large payments on their property purchases.

52.    Virtually all of LUTHER and WADIA's business and personal bank accounts continually exhibited large, structured cash deposits, even in the bank accounts where the deposit of cash did not make sense (internet sales accounts, personal bank accounts). Based on the information contained within this affidavit, I believe that LUTHER and WADIA are laundering the proceeds of the illegal distribution of marijuana by structuring cash deposits into their business bank accounts, and then transferring the money to their personal bank accounts using payroll checks, which are supported by these currency deposits. This creates the appearance of legitimacy for the cash deposits.

**J.      RECONCILIATION OF LUTHER'S BOOKS TO BANK RECORDS**

53.      Investigator Wirth reviewed bank records for LUTHER and WADIA's business bank accounts as shown above. Investigator Wirth also reviewed Quickbooks files for LUTHER and WADIA's businesses, received via Grand Jury subpoena from Certified Public Accountant (CPA) Glenn Cunningham. Investigator Wirth compared the Quickbooks records for counter deposits of cash and checks to LUTHER and WADIA's business and personal bank accounts. The analysis of this comparison showed that, with relatively minor exceptions, LUTHER and WADIA reported the cash deposits to their business bank accounts in their Quickbooks accounting software.

54.      As summarized above, Wirth's review of bank records showed that, during the period 2013 to 2019, LUTHER and WADIA deposited approximately $7.8 million in business receipts to their bank accounts. Of this amount, approximately $4.1 million were cash deposits (cash deposits were 52% of the total deposits).

55.      Investigator Wirth reviewed online accounting records from Xero Inc., which LUTHER and WADIA used for their business activities for Forcefield and Sweet Earth LLC. From a review of the accounting records, it appears that LUTHER and WADIA used the Xero accounting platform for sale quotes and purchase orders, but not for accurately tracking expenses. In essence, it appears that the Xero platform was used to track income and sales but not expenses.  In summary, Investigator Wirth's analysis of the Xero Inc. records show that from March 2016 through April 2020, LUTHER and WADIA reported approximately $3.9 million in sales through Forcefield.

**Declaration of Special Agent Cameron Wall**                              EXHIBIT A   PAGE 31
                                                                                                                    Complaint *In Rem*
                                                                                                                    FOR FORFEITURE

56.     For the period March 2016 through December 2018, Investigator Wirth reviewed both

LUTHER and WADIA's Quickbooks files for Forcefield Inc. and the Xero accounting invoices

for Forcefield Inc. For that period, the Quickbooks files report $4.1 million in total income,

which is split into $2.7 million non-cash income and $1.4 cash income. During the same time

period, the Xero accounts receivable paid account shows approximately $2.6 million in income,

which closely resembles the non-cash income reported in Quickbooks. This indicates that

approximately $1.4 million of Forcefield's sales (a very similar number to the cash income

reported in Quickbooks) were conducted outside of Xero but reported by LUTHER and WADIA

in their Quickbooks files as Forcefield sales. I believe that this indicates that LUTHER and

WADIA are running cash through Forcefield's bank accounts which is not tied to a Xero invoice,

and the true source of this cash is LUTHER's illegal marijuana sales.

57.     In conclusion, LUTHER and WADIA's businesses earned approximately $4.1 million in

cash sales during the period 2013–2019 that can be traced to bank deposits. There are significant

indications, as discussed above, that the source of this cash is not supported by their own Xero

accounting records, and I believe the source of this cash is LUTHER's illegal marijuana sales.

There is no accounting for the cash used to pay for over $2,000,000 in LUTHER and WADIA's

business and personal expenditures summarized below.

## K.    LUTHER'S CASH EXPENDITURES

58.     During the course of this investigation, members of the investigative team reviewed

records from the search warrants at the **Defendant Real Properties** and found indications that

LUTHER paid for large amounts of marijuana-related and personal expenses in cash.

**Declaration of Special Agent Cameron Wall**

Investigators conducted interviews with people/businesses LUTHER paid in cash, as summarized the table below:

| PAYEE | CASH AMOUNT | DATE/DATE RANGE |
|---|---|---|
| Affordable Equipment | $6,000.00 | 02/13/2017 |
| Ashland Electric | $50,922.46 | 11/07/2012–05/06/2014 |
| Blue Star Gas | $467,312.75 | 03/07/2014–12/05/2017 |
| Bryan Perreard Construction | $404,497.00 | 03/01/2017–09/30/2018 |
| KMS AG Consulting LLC | $150,000.00 | 06/13/2019 |
| Fay and Company | $73,930.00 | 01/31/2017–08/15/2019 |
| Gregory Snow | $84,000.00 | 03/2015 |
| Griffith Tonkin | $24,000.00 | 10/08/2016 |
| Hardcastles LLC | $16,266.00 | 07/18/2016–08/11/2016 |
| Integrity Ironworks LLC | $14,174.00 | 03/08/2019–04/10/2019 |
| JM Construction | $58,000.00 | 10/26/2016 |
| John Lyons Trust | $18,600.00 | 05/30/2019 |
| Mountain Motorsports | $22,306.94 | 02/29/2016–08/29/2017 |
| MTC Sales & Consignments | $15,650.00 | 05/27/2018 |
| Quality Water Systems | $169,580.00 | 04/20/2017–02/13/2019 |
| Rick Robertson Logging Inc. | $71,272.53 | 04/04/2017–05/03/2017 |
| Sanders Pump & Irrigation | $107,030.00 | 04/01/2019–09/06/2019 |
| United Rentals | $25,586.73 | 04/20/2016–06/27/2016 |
| White Brothers LLC | $56,000.00 | 05/01/2017–11/01/2017 |
| Pacific Power | $199,848.65 | 12/15/2015–01/15/2019 |
| **TOTAL:** | **$2,034,977.06** | |

59.     From a review of LUTHER and WADIA's business and personal bank records, the above cash payments do not appear to be sourced from money that was deposited into their bank accounts.

60.     For example, investigators spoke with Bryan Perreard (Perreard), owner of Bryan Perreard Construction, about cash payments from LUTHER and what construction services Perreard provided to LUTHER and WADIA. LUTHER paid Perreard at least $404,497.00 in cash for construction Perreard did at **Defendant Real Property 2.** Perreard performed a complete construction and remodel of **Defendant Real Property 2** (it had extensive damage

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A  PAGE 33
                                                                      Complaint *In Rem*
                                                                      FOR FORFEITURE

resulting from a fire in 2014). Perreard's attorney provided a ledger of cash payments from

LUTHER to Perreard, supporting the information above. These cash payments are most likely

proceeds from the sale of LUTHER's black-market marijuana.

## L.    PURCHASE OF 351 HAMILTON ROAD – Defendant Real Property 1

61.    According to a review of available public and subpoenaed real estate documents,

LUTHER and WADIA purchased 8.27 acres at 351 Hamilton Road, Jacksonville, Oregon,

**Defendant Real Property 1**, from Richard and Gayle Lupton for $400,000 on or about October

1, 2010. LUTHER and WADIA made a $109,383.33 down payment using a $1,000 earnest

money check, a U.S. Bank cashier's check for $18,383.33, and a $90,000 wire transfer from a

Charles Schwab investment account in the names of LUTHER and WADIA.  The Lupton family

seller-financed the $290,000 balance on the property purchase using an All-Inclusive Deed of

Trust against the property.  LUTHER and WADIA agreed to pay the balance on the property at

5.75% interest in $2,150 monthly payments from November 1, 2010 to October 1, 2015, when

the entire balance would be due (including principal, penalties, and interest).  The purchase

closing documents show the loan payments were to be paid through Pacific Trust Deed Servicing

Company, which is a collection escrow business offering collection of payments for non-bank-

financed real estate notes.

62.    On or about April 15, 2015, a Bargain and Sale Deed was filed in which LUTHER and

WADIA, as Grantors of **Defendant Real Property 1**, transferred the property to the Zindagi

Revocable Trust UDD – Travis David Luther and Farinaz Wadia, Co-Trustees. The deed listed

the stated consideration as, "the actual consideration consists of, or includes, other property or

other value given or promised, which value was the whole consideration."

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A  PAGE 34
                                                                                 Complaint *In Rem*
                                                                                 FOR FORFEITURE

63.     LUTHER and WADIA made regular and scheduled payments of $2,150.00 a month on the loan through payments to Pacific Trust Deed Servicing, up through the January 2015 payment. These monthly payments were made from WADIA's USB 7152 bank account going back to at least January 2013, when the subpoenaed bank records start. The loan balance in January 2015 was $246,317.13, which was due in full by October 1, 2015. Beginning in January 2015, WADIA started making a series of larger payments of $8,843.00 from USB 7152, in addition to the continuing monthly payments of $2,150.00.

64.     From May 2015 to August 2015, some of the **Defendant Real Property 1** loan payments were also made from LUTHER's USB 8254 account totaling $97,371.00. These payments consisted of multiple checks of approximately $8,850.00 each (less about $34.00 in fees). These checks were funded by round-dollar cash deposits as outlined below.

65.     On September 4, 2015, LUTHER and WADIA made the final payment of $75,000.00 on the loan via a $25,000.00 check from USB 8254 and a $50,000.00 check from USB 7152. These checks were funded by two credit line advances, which were later paid back by LUTHER and WADIA.

66.     The primary source of funds for WADIA's USB 7152 account were payroll checks and other checks from Horn OK LLC USB 5687. WADIA received bi-weekly checks of $1,142.95 from USB 5687 and deposited them into USB 7152. Beginning on January 28, 2015, WADIA started receiving larger checks of $8,852.00 from USB 5687 and deposited them into USB 7152. These large checks correspond to a period of intense, large, round-dollar amount cash deposit activity in USB 5687. From January 2015 to September 2015, there were at least 22 round-dollar

**Declaration of Special Agent Cameron Wall**

cash deposits totaling $131,151.00 made into USB 5687. In comparison, there was only $58,005.00 in cash deposits made to USB 5687 in all of 2013 and 2014.

67.     Similarly, from February 2015 to July 2015, there were $79,652.00 total in deposits made to USB 8254. These deposits consisted of $8,850.00 checks from Umpqua 0169 in the name of 1-2-Tree LLC (discussed above). The $8,850.00 checks from Umpqua 0169 to USB 8254 were funded by a series of $5,000.00 cash deposits made to the account, totaling $86,640 (there was also an opening deposit of $1,620.00, and one deposit was for $5,020.00).

68.     In conclusion, round-dollar cash deposits were used to fund at least $168,163.00 in loan payments on **Defendant Real Property 1**. The round-dollar cash deposits were made to business bank accounts and distributed to LUTHER and WADIA's personal accounts by appearing as payroll checks. These cash deposits are most likely proceeds from the sale of LUTHER's black-market marijuana and are being laundered through LUTHER and WADIA's businesses as legitimate payroll payments in order to disguise the true nature and source of the funds being used to pay for **Defendant Real Property 1**.  LUTHER and WADIA then used the funds to make at least $168,163.00 in loan payments on **Defendant Real Property 1**.

**M.     PURCHASE OF 528 LOMAS ROAD – Defendant Real Property 2**

69.     According to a review of publicly available and subpoenaed real estate documents, Hanuman LLC purchased 528 Lomas Road, Jacksonville, Oregon, **Defendant Real Property 2**, for $875,000 from the Gregory T. Snow trust on or about May 8, 2015.  **Defendant Real Property 2** is adjacent to **Defendant Real Property 1** and consists of 113.24 acres of farmland and a large residence that was partially destroyed by a fire in 2013. According to the original sales agreement, LUTHER and WADIA are listed as the buyers representing Hanuman LLC.

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A  PAGE 36
                                                       Complaint *In Rem*
                                                       FOR FORFEITURE

70.    According to the settlement statement, LUTHER and WADIA put down $9,000 earnest money and $75,000 as a down payment.  The settlement statement reflects payments of $9,000, $15,000, and $60,320.55.  Snow was interviewed by investigators and confirmed that LUTHER paid Snow $60,000 in currency as part of the real estate purchase (Snow also believes that LUTHER paid the remaining $24,000 of the down payment in cash, but his memory was less sure about that).

71.    The sales agreement between LUTHER/WADIA/Hanuman LLC and the seller provides for the payment of the $791,000 balance pursuant to a promissory note, detailing monthly $3,777 payments over 30 years, at 4% annual interest.  The agreement also requires a principal reduction of $300,000 within two years of the close of escrow (which was May 8, 2017), after which the payments would be re-amortized over the remaining 28 years at 4% interest.

72.    LUTHER began making payments in June 2015 on the loan in the amount of $3,788.50 (which included a monthly fee of $11.50) from USB 8254. The payments were made on time from June 2015 to July 2017, until the $300,000 balloon payment was due. USB 8254 received monthly $4,000 cash deposits, which correspond almost exactly to these mortgage payments. At the same time, LUTHER and WADIA start reporting gross rents of $4,000 through an entity called Hanuman LLC. LUTHER and WADIA reported these rent payments on Form 1120S in the following amounts: tax year 2015 – $28,000; tax year 2016 – $48,000; and tax year 2017 – $48,000.  Per the notes from LUTHER and WADIA's CPA, Glenn Cunningham, from a meeting on June 21, 2017, "someone is growing weed on property – paying $4,000 per month rent." Cunningham also asked WADIA about possibly obtaining a line of credit on **Defendant Real Property 1** to pay the mortgage payments on **Defendant Real Property 2**, but WADIA told

Cunningham no, due to the condition of the house and LUTHER growing marijuana for medical use. All told, LUTHER paid at least $192,000.00 in 51 monthly $3,788.50 mortgage payments through Pacific Trust Deed Servicing.

73.    LUTHER and WADIA worked with Snow to make payments on the $300,000 balloon payment, as shown in the table below:

| Date | Net Payment Amount (Less $11.50 processing fee) | Funding Account |
|------|--------------------------------------------------|-----------------|
| 07/10/2017 | $93,488.50 | USB 8254 |
| 08/24/2017 | $56,511.50 | USB 7152 |
| 04/30/2018 | $49,988.50 | Hanuman LLC – JPM 6077 |
| 08/07/2018 | $74,988.50 | Hanuman LLC – JPM 6077 |
| 12/18/2018 | $24,988.50 | Hanuman LLC – JPM 6077 |
| Total: | $299,965.50 | |

74.    The first balloon payment on July 10, 2017, of $93,500.00 was made via check 1353 from USB 8254. The bulk of the funds used for the check come from USB 7152 ($35,100.00) and USB 5687 ($41,500.00). During this time, USB 8254 and USB 7152 received regular payroll checks from Indika, White's Country Farm, and Forcefield LLC's business bank accounts. Beginning in May 2017, USB 8254 began receiving regular cash deposits of $4,508.70, which represented payroll from Forcefield LLC's undeposited funds account. This regular cash deposit increased to $4,657.70 in February 2018. Also, beginning in May 2017, USB 7152 began receiving regular cash deposits of $4,544.70 (which also increased to $4,691.70 in February 2018). These cash payments, plus business line of credit draws, covered the balloon payment of $93,500. Based on the information contained within this affidavit, these cash deposits are most likely proceeds from the sale of LUTHER's black-market marijuana and are being laundered

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A  PAGE 38

through LUTHER and WADIA's business and personal bank accounts in order to disguise the true nature and source of the funds being used to pay for **Defendant Real Property 1**.

75.    The second balloon payment on August 24, 2017, of $56,525.00 was primarily funded by a cash deposit of $41,523.00 made to USB 7152. There was also a $15,000 business line of credit that went to fund part of this balloon payment. Based on the information contained within this affidavit, the cash deposits are most likely proceeds from the sale of LUTHER's black-market marijuana and are being laundering through LUTHER and WADIA's bank accounts in order to disguise the true nature and source of the funds.

76.    The third balloon payment on April 30, 2018, came from a new account at JPMorgan Chase Bank, account 6077, which was opened in March 2018 in the name of Hanuman LLC. JPM 6077 began receiving $4,000 monthly cash rent deposits (as discussed above) rather than USB 8254, which was closed down in June 2018. JPM 6077 received a check from USB 8254 on 04/17/2018 in the amount of $39,000.00 which was used to fund a portion of this balloon payment. This check was primarily funded by payroll checks Indika, White's Country Store, and Forcefield LLC, which again, were primarily funded by cash deposits into the business bank accounts. This an example of LUTHER and WADIA using their businesses and payroll checks in order to disguise the true nature of the proceeds used to make payments on the mortgage loan for **Defendant Real Property 2**. The cash deposits are most likely proceeds from the sale of LUTHER's black-market marijuana and are being laundering through LUTHER and WADIA's bank accounts in order to disguise the true nature and source of the funds.

77.    The fourth balloon payment on August 7, 2018, of $75,000.00 came from JPM 6077. This payment was ultimately funded by a $127,875.00 wire transfer that flowed through

WADIA's accounts at Rogue Valley Credit Union and White's Country Store business bank accounts to JPM 6077. The wire transfer came from Joshua Brown and is believed to be a payment for hemp seeds that is now part of a $20,000,000 lawsuit against Brown and LUTHER. It is not alleged that this payment was funded by LUTHER's black-market marijuana distribution activities, because these funds are believed to be related to the hemp seed sales activity outlined in the lawsuit referenced above.

78.     The fifth balloon payment on December 18, 2018, was ultimately funded by a check from TSN Agricorp Ltd. These funds are believed to be from LUTHER's new legal hemp business, Sweet Earth that is being run by LUTHER and Sam Nastat out of Modesto, California. It is not alleged that this payment was funded by LUTHER's black-market marijuana distribution activities.

79.     In conclusion, a large portion of the funds used to pay for the down payment and mortgage payments for **Defendant Real Property 2** came from large, even-dollar cash deposits made to a variety of LUTHER and WADIA's business and personal bank accounts. Based on the information contained within this affidavit, these cash deposits are most likely proceeds from the sale of LUTHER's black-market marijuana and are being laundered through LUTHER and WADIA's businesses as legitimate payroll payments in order to disguise the true nature and source of the funds being used to pay for **Defendant Real Property 2**.

## Conclusion

80.     The evidence in this declaration provides probable cause to believe, and I do believe that **Defendant Real Properties** were purchased with the proceeds of the sale of an illegal substance (marijuana) in violation of the Uniform Controlled Substances Act, Title 21, United States Code,

**Declaration of Special Agent Cameron Wall**                    EXHIBIT A   PAGE 40
                                                                Complaint *In Rem*
                                                                FOR FORFEITURE

Section 841 *et seq.*, and are therefore subject to forfeiture pursuant to Title 21, United States Code, Sections 881(a)(6).

81.    The evidence in this declaration provides probable cause to believe, and I do believe that the **Defendant Real Properties** were also involved in financial transactions conducted with the intent to promote the carrying on of illegal marijuana manufacturing and conceal the nature and source of the funds used to purchase the properties in violation of Title 18, United States Code, Section 1956, and are therefore subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A).

82.    The evidence in this declaration also provides probable cause to believe, and I do believe, that **Defendant Real Property 1** was used to facilitate a scheme to illegally produce and distribute marijuana, in violation of Title 21, United States Code, Section 841, 846, and 856, and is therefore subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(7).

83.    I have presented this declaration to Assistant United States Attorney Julia Jarrett who has advised me that in her opinion, the proposed complaint is supported by probable cause.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed this 6th day of November 2020.

*/s/ Cameron Wall*
CAMERON WALL
Special Agent
Internal Revenue Service – Criminal Investigations

**Declaration of Special Agent Cameron Wall**                         EXHIBIT A   PAGE 41
                                                                               Complaint *In Rem*
                                                                               FOR FORFEITURE

~JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

## DEFENDANTS

**(b)**  County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☐ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☐ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       another district
       (specify)

☐ 6  Multidistrict
       Litigation

☐ 7  Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #

AMOUNT

APPLYING IFP

JUDGE

MAG. JUDGE